IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| JRMING YANG and | ) | |
| TING YU WANG | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 150273D |
| | ) | |
| v. | ) | |
| | ) | |
| BENTON COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision, signed by

Presiding Magistrate Tanner and entered October 16, 2015. The court did not receive a

statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-

MD 16 C(1).

Plaintiffs appeal the 2014-15 real market value of property identified as Account 352178

(subject property). A trial was held in the Oregon Tax Mediation Center on July 8, 2015, in

Salem, Oregon. Jrming Yang (Yang) appeared and testified on behalf of Plaintiffs. Caleb

Nelson (Nelson), an Oregon registered appraiser and Benton County sales data analyst, appeared

and testified on behalf of Defendant. Plaintiffs' Exhibits 1 and 2 and Defendant's Exhibits A

and B were received without objection.

## I. STATEMENT OF FACTS

Nelson testified that the subject property is a single family residence built in 1997.

Nelson testified that the subject property is "located in the Timberhill area of Corvallis * * * the

northern section, which has favorable marketability in the area." Nelson testified the subject

property has "eleven total rooms, three bedrooms and three bathrooms." The parties agreed that

/ / /

the subject property's lot size is 0.30 acres and the residence includes a two car garage, a porch and a deck, a shop in the basement, and a fireplace. (*See* Ptfs' Ex 1 at 3; Def's Ex A at 5.)

Yang testified that Plaintiffs purchased the subject property, in March of 2012 from an unrelated seller, paying $425,000. Yang testified that prior to the January 1, 2014, assessment date, he replaced countertops in the "kitchen, * * * in the master bedroom, as well as one of the bathrooms." Yang also testified that several kitchen appliances were replaced, including a refrigerator, cooktop, wall oven, and dishwasher.

In the Complaint, Plaintiffs listed tax roll real market values for 16 properties located on the subject property's street. (Ptfs' Compl at 4.) Excluding the subject property, Plaintiffs determined that the real market value of the 15 properties increased year-to-year, ranging from 1.73 percent to 2.05 percent. (*Id.*) Using those real market values, Plaintiffs computed the average real market value for the 15 properties increase to be 1.90 percent for 2014. (*Id.*) Plaintiffs stated that the subject property's real market value increased 13.48 percent between tax years 2013-14 and 2014-15. (*Id.*) Yang testified that "the percentage change in market value should be consistent for houses in the same neighborhood." (*See* Ptfs' Compl at 3.) After applying a 1.90 percent increase to the subject property's purchase price of $425,000, Plaintiffs requested a real market value of $433,073. (*Id.*)

Yang testified that the reason for the increase in the subject property's real market value was the reclassification from a "Class 4 to a Class 5 type." (Pt's Compl at 3; Def's Ex A at 5.) Yang testified that after Plaintiffs purchased the subject property, Defendant reclassified the subject property. Nelson testified that the subject property is a "lower end custom built" residence, with "custom construction built to fit the lot, and [that] the materials used in the construction are good quality." Nelson testified that by comparison "Class 4" properties are

generally "spec construction built by a mass builder. [The subject property] was built by a smaller, individual construction company that builds custom homes."

A.      *Plaintiffs' Evidence*

In support of their requested real market value, Plaintiffs submitted an appraisal report of the subject property and the tax records of two nearby properties for the 2014-15 tax year. (Ptfs' Exs 1, 2.) The individual who prepared the appraisal report did not testify. Yang testified that the appraisal report was prepared for a mortgage company in March of 2012. The appraisal report listed five comparable properties between 0.23 miles and 0.93 miles from the subject property, with sale prices ranging from $402,000 to $450,000. (Ptfs' Ex 1 at 3, 8.)

Plaintiffs provided the tax records for two properties: one property was located on the subject property's street (Property A), and the other property was located nearby (Property B). (Ptfs' Ex 2 at 1-2.) Plaintiffs stated in a letter that the two properties were "similar" to the subject property with real market values that are "much lower" than the subject property. (Ptfs' Ltr at 1, June 14, 2015.) Property A's 2014-15 total tax roll real market value was $412,110 and the assessed value was $368,293. (Ptfs' Ex 2 at 1.) Property B's 2014-15 total tax roll real market value and assessed value was $417,860. (Ptfs' Ex 2 at 2.) Plaintiffs' letter stated that Property B is "considered much more upscale" than the subject property, and "has [a] better view, three-car garage, and balcony on both first and second floors." (Ptfs' Ltr at 1, June 14, 2015.) Plaintiffs stated "[he] would be willing to pay more than $425,000 to buy that house." (*Id*.)

B.      *Defendant's Evidence*

Nelson testified that because the single family residence was "owner occupied," and constructed 17 years ago, the income approach and cost approach were not "considered

meaningful" when determining the subject property's real market value. (Def's Ex A at 5.) Nelson relied on the sales comparison approach and submitted evidence of the sales of six comparable properties; all but one property were located within a mile of the subject property. (Def's Ex A at 5-6.) Nelson testified that the comparable properties were selected for similar quality, design, classification, and sale dates near the assessment date of January 1, 2014. Nelson testified that the "properties that [had] two stor[ies] plus a finished basement were sought after." Nelson testified that three of the comparable sales were located in the north Corvallis area, and three additional comparable properties were located in the subject property's "immediate area." Each of the comparable properties was classified as a "Class 5" property, and was built between 1990 and 1997. (*See* Def's Ex A at 5-6.) Nelson's comparable properties had a total gross living area ranging from 2,435 square feet to 3,051 square feet. (*Id*.) Nelson testified that adjustments were made to the sales prices "to bring them to the January 1, 2014 effective date and compare them to the subject property."

In order to calculate the appropriate adjustments, Nelson testified that paired sales were used to "determine what the market value of that adjustment should be." To adjust for "market change," Nelson testified a "double sale of a property (Comparable #5) in the Timberhill area" was used "to bring the sale date to the effective date." Comparable #5 was first sold in June of 2013 for a price of $470,000 and nine months later, the property was sold again in March of 2014 for a price of $498,000. (Def's Ex B at 1.) With a net change of $28,000 over nine months, Nelson determined that the "monthly change in the market" was 0.64 percent per month. (*Id*.) Nelson testified that the time trend factor extrapolated from Comparable #5 was applied to the comparable sales to adjust for the "change that took place during that time period." Nelson testified that other adjustments for lot size and the view were made.

Nelson testified that a paired sale was used to determine a square footage adjustment. (Def's Ex B at 2.) Those properties were located on the same street and sold within three weeks of each other. (*Id*.) One property's sale price was adjusted $4,400 to account for differences in year built and lot size for final sale prices of $379,400 and $390,500. (*Id*.) Taking the difference of $11,100 in sale prices, and the difference of 154 square feet, Nelson determined that the square footage adjustment was $72.08. (*Id*.) Nelson testified that adjustment values for "minor features" were determined by using Marshall & Swift Valuation Service, an Oregon Department of Revenue cost factor book, and "cost values obtained through Home Depot." Nelson determined the adjustment for lot size using the difference in sale price for two land sales in the Timberhill area. (Def's Ex B at 1.)

C.      *Square Footage of the Subject Property*

The exhibits both parties submitted contained discrepancies in the subject property's square footage. The sketch submitted by Defendant concluded that the upper floor of the subject property measured 1,162 square feet. (Def's Ex A at 3.) Plaintiffs submitted a sketch that measured the upper floor as 1,052 square feet. (Ptfs' Ex 1 at 21-22.) Nelson testified that upon receiving the exhibits from Plaintiffs, he noticed the discrepancy in square footage of the upper floor. Nelson was unable to revisit the subject property prior to trial, but Nelson testified that he "went on to Google Earth and looked at the exterior" to reevaluate the square footage discrepancy. Nelson submitted rebuttal evidence, amending the square footage of the upper floor to a total of 994 square feet. (Def's Rebuttal Ex D at 1.) Nelson testified that this is less than the total square footage calculated by Plaintiffs' appraiser. Nelson then took the difference in square footage of 168 square feet and applied a $72 square footage adjustment derived from a paired sale. (Def's Rebuttal Ex D at 1; Def's Ex B at 1-2.) Nelson testified that he determined a

"downward value adjustment of $12,096" to the subject property's real market value.

(Def's Rebuttal Ex D at 1.) Nelson testified that the subject property's real market value after adjustment was $471,000.

## II. ANALYSIS

The issue before the court is the subject property's real market value for the 2014-15 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1) which states:[1]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; ORS 308.210. Real market value is to be determined by the methods and procedures adopted by the Department of Revenue. ORS 308.205(2). When determining the real market value of a property there are three approaches of valuation that must be considered: (1) the cost approach, (2) the sales comparison or comparable sales approach, and (3) the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *see also* OAR 150-308.205(A)(2)(a) (stating that all three approaches must be considered even though all three approaches may not be applicable to valuation of the subject property). The applicable valuation approach is a question of fact that will be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979). Because the subject property is a residence and is not an income

/ / /

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

producing property, the income approach is not applicable. Neither party considered the cost approach. (Ptfs' Ex 1 at 4; Def's Ex A at 5.)

In proceedings before a magistrate of the Tax Court the party seeking affirmative relief bears the burden of proving their case by a preponderance of the evidence. ORS 305.427. As the party seeking affirmative relief, Plaintiffs must establish that the subject property's real market value is incorrect on the tax roll "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Etzger v. Clatsop County Assessor*, TC-MD 120534D, WL 5350257 at *3 (Oct 30, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

A.      *Square Footage of the Subject Property*

The parties' exhibits contained a disagreement on the subject property's square footage. The appraisal Plaintiffs submitted as evidence, stated that the subject property had 2,544 gross square feet of living area, whereas Defendant stated the living area totaled 2,662 square feet. (Ptf's Ex 1 at 3; Def's Ex A at 2.) Defendant submitted rebuttal evidence amending the square footage of the subject property's upper floor for a square footage reduction of 168 square feet. (Def's Rebuttal Ex D at 1.) Plaintiffs did not object to Nelson's amendment to the subject

property's square footage and the court accepts Nelson's determination that the correct square footage of the subject property is 2,494 square feet.

B.        *Plaintiffs' Purchase of Subject Property*

Plaintiffs' determination of the subject property's real market value relies in part on their March 2012 purchase price. When determining real market value, the sales price of a recent, voluntary arm's-length transaction, while not conclusive, is very persuasive of real market value. *Kem v. Dept. of Rev.*, (*Kem*) 267 Or 111, 114, 514 P2d 1335 (1973); *see also Sabin v. Dept. of Rev.* (*Sabin*), 270 Or 422, 426-7, 528 P2d 69 (1974); *Equity Land Res. v. Dept. or Rev.*, 268 Or 410, 414-15, 521 P2d 324 (1974). Two important considerations are whether the sale was an "arm's-length" transaction and whether the sale was "recent." *Kem*, 267 Or at 114-15.

The parties agree that Plaintiffs' purchase of the subject property in 2012 was an arm's-length transaction. Yang testified that Plaintiffs purchased the subject property from an unrelated seller and Defendant has submitted no evidence to the contrary.

Next, the court now considers whether the March 2012 purchase of the subject property was "recent" as of the January 1, 2014, assessment date. Plaintiffs seeks to use the March 2012 purchase price of $425,000 as the basis for their requested real market value of $433,973 for the 2014-15 tax year. The assessment date for the 2014-15 tax year was January 1, 2014. ORS 308.210(1). The Oregon Supreme court states that "[w]hether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin*, 270 Or at 426-27. Evidence before the court suggests that there was a change in market conditions between the purchase of the subject property in March 2012 and the assessment date of January 1, 2014. Defendant submitted evidence through a "double sale" that market

conditions changed 0.64 percent per month between June of 2013 and March of 2014 alone. (Def's Ex B at 1.) Plaintiffs submitted no evidence asserting that conditions at the time the subject property was purchased and the time of the assessment were, in fact, similar. Considering the significant span of time between the purchase date and the assessment date, and Defendant's evidence of changing market conditions, the court concludes that the March 2012 purchase of the subject property is not "recent" for purposes of the January 1, 2014 assessment date. Because the sale of the subject property is not "recent," the court does not find it persuasive evidence of the subject property's real market value for the 2014-15 tax year.

C.      *Comparable Sales Approach*

A comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp. v. Lane County Assessor*, TC-MD 060354D, WL 1068455 at *3 (Apr 3, 2007), citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001). ORS 308.205(2) provides in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." The Department of Revenue has adopted OAR 150-308.205-(A)(2)(c), which states in part:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

In support of Plaintiffs' requested real market value, Plaintiffs rely on an appraisal report for the subject property completed in March of 2012, and the real market value of neighboring properties. (Ptfs' Ex 1 at 1; Ptfs' Compl at 4; Ptfs' Ex 2 at 1-2.) Without the appraiser's testimony, the court gives no weight to an appraisal report completed almost two years before the assessment date.

Defendant's testimony stated that the subject property has undergone changes since the appraisal report was completed in March of 2012. Yang testified that since purchasing the subject property he has made improvements to the interior of the subject property in the "kitchen, * * * in the master bedroom, as well as one of the bathrooms." No evidence was submitted to provide an estimate of the real market value of those improvements. Because those changes potentially affect the real market value between the appraisal date and the assessment date, the court finds Plaintiffs' evidence was insufficient to support Plaintiffs' requested 2014-15 real market value.

D.      *Plaintiffs' Real Market Value Evidence*

Plaintiffs rely on the real market values of neighboring properties to support their requested real market value of $433,073 for the subject property. Plaintiffs' evidence of real market values was: (1) a list of the real market value of the 15 properties located on the same street as the subject property, and (2) the tax records of two nearby properties. (Ptfs' Compl at 4; Ptfs' Ex 2 at 1-2.) Plaintiffs alleged that the neighboring properties are similar to the subject property and the subject property's real market value should be consistent with the real market value of those properties.

Plaintiffs provided a spreadsheet listing the real market values of the 15 properties stated on the tax roll, concluding that the average increase in real market value was 1.9 percent for the 2014-15 tax year. (Ptfs' Compl at 4.) Plaintiffs argue that the subject property's increase in real market value should be consistent with the other properties. There is no presumption that the values found on the tax rolls are indications of the actual real market value of the property. *See J.R. Widmer, Inc. v. Dept. of Rev.*, 261 Or 371, 375, 494 P2d 854 (1972) (holding that the presumption of procedural regularity did not extend to value determinations).

Plaintiffs' evidence of the tax roll real market values of two nearby properties do not provide persuasive evidence of the subject property's real market value. The information found on the tax rolls does not provide the court with information that can be used under one of the three approaches of valuation (cost, sales comparison, or income) as required by ORS 308.205(2). Under the comparable sales approach, the court will only consider arm's-length transactions of properties adjusted to be comparable to the subject property as evidence of the subject property's real market value. A tax record is not evidence of an arm's-length transaction—the amount of cash an informed buyer would be willing to pay an informed seller—and provides no evidence of the real market value. Defendant relied on paired sales analysis to conclude that the real market value of neighboring properties increased by 13.48 percent for the same time period. The court finds that sales of similar properties are a better indicator of real market value than tax roll values.

As the party seeking affirmative relief, the Plaintiff bears the burden of establishing his claim by the greater weight of the evidence. Plaintiffs' evidence in support of their requested real market value is unpersuasive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Unfortunately, Plaintiffs have failed to carry their burden of proof.

Even though Plaintiffs have failed to carry their burden of proof and the "burden of going forward with the evidence" has not shifted, this court has jurisdiction to determine the real market value or correct valuation on the basis of evidence before the court, without regard to the values pleaded by the parties. ORS 305.427; ORS 305.412.

/ / /

/ / /

E.    *Defendant's Evidence*

Nelson relied on the sales comparison approach in his appraisal report to determine the subject property's real market value for the 2014-15 tax year.  (Def's Ex A at 1.)  His appraisal report included six comparable sales located near the subject property.  (Def's Ex A at 5-6.)  Each of the properties was classified as a "Class 5" property, and Nelson testified that he adjusted the sales prices of the comparable properties to the January 1, 2014, assessment date.  Nelson's adjustments to the comparable properties were based on paired sales and a double sale.  (*Id.*)  The adjusted sales prices of those comparable properties demonstrated a value range of $427,056 to $494,580 with an average adjusted sales price of $473,494.  (*Id.*)

The court acknowledges that the amendment to the subject property's square footage will affect the square footage values Nelson attributed to each of the comparable properties in his appraisal.  Because those values will affect each comparable property proportionally, the court concludes that adjustment is not significant enough to render the conclusions reached by Nelson's appraisal unpersuasive.  Nelson reduced Defendant's requested real market value of the subject property from $483,000 to $471,000 as a result of the square foot adjustment.  Based on the evidence and testimony, the court accepts Nelson's determination that the subject property's real market value as of January 1, 2014, was $471,000.

The court determines that the subject property's real market value is $471,000.  The subject property's maximum assessed value and assessed value is $364,336 for the 2014-15 tax year.  (Ptfs' Compl at 2.)  The court's determined real market value is greater than the subject property's assessed value.  The court cannot order a change to the tax rolls unless Plaintiffs are aggrieved.  ORS 305.275.  Plaintiffs are only aggrieved if the change to the tax rolls would result in a reduction of their property taxes.  *Parks Westsac L.L.C. v. Dept. of Rev.*, 15 OTR 50, 52

(1999). The court has no evidence to conclude that Plaintiffs' property taxes will be reduced for the 2014-15 tax year based on the court's determined real market value.

### III.  CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that Plaintiffs failed to carry the burden of proof. Defendant provided sufficient evidence to support its determination that the subject property's 2014-15 real market value is $471,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that, if the court's determined 2014-15 real market value of $471,000 would result in a tax reduction for Plaintiffs, the court concludes that the tax roll value for the subject property shall be changed accordingly.

Dated this ___ day of November 2015.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on November 2, 2015.*